SYLLABUS

This syllabus is not part of the Court's opinion.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Antonio Fuster v. Township of Chatham** (A-33-23) (089030)

**Argued September 24, 2024 -- Decided January 21, 2025**

**WAINER APTER, J., writing for a unanimous Court.**

In this appeal, the Court considers whether plaintiffs Antonio Fuster and his wife, Brianne Devine, may access the body worn camera recording of a statement Fuster made to the Chatham Township Police Department.

In May 2022, Fuster went to the Chatham Township Police Department to report that his special needs child had accused an adult male relative of sexual misconduct.  Police interviewed Fuster, and the conversation was recorded on a body worn camera.  Fuster and Devine reviewed the initial police report based on the interview and informed police that the report was inaccurate.

Fuster submitted an Open Public Records Act (OPRA) request for any written police reports and the body worn camera video footage of his interview.  A records clerk denied the request for the video.  The next day, Fuster submitted another OPRA request, this time stating that he was requesting copies of the video under the common law.  Fuster also emailed Chatham records custodian Gregory LaConte to request that the video recording be preserved for three years pursuant to the Body Worn Camera Law (BWCL), N.J.S.A. 40A:14-118.5.  Devine also submitted an OPRA Request Form, requesting to view the video of Fuster's in-person interview "to determine whether or not to file a request for a 3 year retention period."  LaConte sent Fuster and Devine identical letters denying their OPRA requests.

Plaintiffs filed a complaint against the Township of Chatham and LaConte (together, defendants).  The trial court entered judgment in favor of defendants.  The Appellate Division affirmed, concluding that the four "exemptions listed in N.J.S.A. 40A:14-118.5(*l*) are in addition to OPRA's exemptions" and that "the video was exempt from disclosure under judicial case" law's "well-established confidentiality exemption protecting an uncharged person's law enforcement records from disclosure."  477 N.J. Super. 477, 491, 493, 498 (App. Div. 2023).  The Court granted certification.  257 N.J. 18 (2024).

1

**HELD:** Subsection (k) of N.J.S.A. 40A:14-118.5 does not permit plaintiffs to review the video in this case because Fuster has already requested that the video be retained for three years and Devine is neither the subject of the video nor one of the other specified persons entitled to review. The Court does not decide whether subsection (*l*) of the BWCL abrogates OPRA's exemptions because there is no OPRA exemption that supports defendants' refusal to release the video in this case. OPRA does not contain any explicit exemption for information received by law enforcement regarding an individual who was not arrested or charged. Neither has New Jersey case law ever held that such information must automatically be withheld under OPRA. The Court therefore reverses the Appellate Division's judgment and orders that the body worn camera footage be released to plaintiffs under the circumstances of this case, without reaching plaintiffs' common law claims.

1. Enacted in 2020, the BWCL provides that the subject of a video, as defined in N.J.S.A. 40A:14-118.5(a) -- or the subject's parent or legal guardian, or next of kin or designee -- "shall be permitted to review [a] body worn camera recording in accordance with the provisions of [N.J.S.A. 47:1A-1 to -13, i.e., OPRA] to determine whether to request a three-year retention period." N.J.S.A. 40A:14-118.5(k). Here, defendants erred in refusing to permit Fuster to review the video "to determine whether to request a three-year retention period." However, because he went ahead and requested the extended retention period anyway, subsection (k) no longer grants Fuster the right to review the video. And subsection (k) never provided such a right to Devine, as she is neither a subject of the recording nor one of the other specified persons entitled to review under that provision. Subsection (k) therefore does not help plaintiffs in this case. (pp. 16-19)

2. N.J.S.A. 40A:14-118.5(*l*) states that, "[n]otwithstanding that a criminal investigatory record does not constitute a government record under [N.J.S.A. 47:1A-1.1, OPRA's definitions section], only the following body worn camera recordings shall be exempt from public inspection." It then lists four categories of exempted recordings, none of which apply here. The word "only" most naturally suggests that the four exemptions enumerated in subsection (*l*) are the sole and exclusive types of "body worn camera recordings" that "shall be exempt from public inspection." But despite the Legislature's use of the word "only," it is not clear that the Legislature meant for the four exemptions delineated in subsection (*l*) to be the only types of body worn camera video not available for public inspection without regard to OPRA's separately enumerated exemptions. First, the Legislature repeatedly referenced OPRA in the BWCL. Second, it is not clear why the Legislature would have included the "notwithstanding" clause in subsection (*l*) if the Legislature meant for the BWCL to displace, rather than complement, OPRA when it comes to body worn camera videos. Ultimately, the Court does not decide whether subsection (*l*) of the BWCL abrogates OPRA's exemptions because there is no OPRA exemption that supports defendants' refusal to release the video in this case. (pp. 19-24)

2

3.  Defendants here seek to exempt the footage from disclosure under two provisions of OPRA:  N.J.S.A. 47:1A-9(b) and N.J.S.A. 47:1A-1.  N.J.S.A. 47:1A-9(b) states that OPRA "shall not abrogate or erode any . . . grant of confidentiality heretofore established or recognized by the Constitution of this State, statute, court rule or judicial case law."  The trial court and Appellate Division rooted that exemption in North Jersey Media Group Inc. v. Bergen County Prosecutor's Office (BCPO), which held, in what it referred to as a "matter of first impression," that "records relating to a person who has not been arrested or charged with an offense are entitled to confidentiality based upon long-established judicial precedent."  447 N.J. Super. 182, 189 (App. Div. 2016).  But BCPO was decided long after OPRA took effect, and none of the pre-OPRA cases on which it relied create any automatic grant of confidentiality for all law enforcement records related to a person not arrested or charged with a crime.  Before OPRA was enacted, judicial case law in New Jersey had not established or recognized any automatic grant of confidentiality for all law enforcement records related to a person not arrested or charged with an offense.  There was therefore nothing in this regard for OPRA to not "abrogate or erode" under N.J.S.A. 47:1A-9(b) when it came into effect.  (pp. 24-30)

4.  Nor does the protection of a "citizen's reasonable expectation of privacy," N.J.S.A 47:1A-1, justify withholding the video under OPRA.  When assessing whether a disclosure would violate a citizen's reasonable expectation of privacy, the Court considers the seven factors set forth in Doe v. Poritz, 142 N.J. 1, 88 (1995).  Here, the party seeking access to the body worn camera video is not a third party but the subject of the video.  And the withheld footage, required by law to be made, is not a recording of the State's investigation, but a verbatim recording of Fuster's own complaint as he made it to the police (Doe factors one and two).  In terms of the privacy interests of the adult male relative, if Fuster wished to publicize the allegations, he could film himself making them again and broadcast the video on social media or to news sites (factors three and five).  Disclosing a body worn camera recording to an alleged victim of their own statement would not discourage alleged victims from providing information to law enforcement (factor four).  In this case, plaintiffs seek to inspect the video to advocate for their child and possibly file an internal affairs report (factor six).  Finally, under the State Constitution, "[a] victim of a crime shall be treated with fairness, compassion and respect by the criminal justice system."  N.J. Const. art. I, ¶ 22.  Prohibiting an alleged crime victim from inspecting the body worn camera recording of their own police statement does not honor that mandate (factor seven).  (pp. 31-35)

**REVERSED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FASCIALE, and NORIEGA join in JUSTICE WAINER APTER's opinion.  JUSTICE PIERRE-LOUIS did not participate.**

3

SUPREME COURT OF NEW JERSEY

A-33 September Term 2023

089030

Antonio Fuster and
Brianna Devine,

Plaintiffs-Appellants,

v.

Township of Chatham and
Gregory LaConte, in his
official capacity as
Records Custodian,

Defendants-Respondents.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
477 N.J. Super. 477 (App. Div. 2023).

| Argued | Decided |
| --- | --- |
| September 24, 2024 | January 21, 2025 |

CJ Griffin argued the cause for appellants (Pashman
Stein Walder Hayden, attorneys; CJ Griffin, on the
briefs).

William W. Northgrave argued the cause for respondents
(McManimon, Scotland & Baumann, attorneys; William
W. Northgrave, Ted J. Del Guercio, III, and Jessica F.
Silva, on the briefs).

Alexander Shalom argued the cause for amicus curiae
American Civil Liberties Union of New Jersey
(Lowenstein Sandler and American Civil Liberties Union

1

of New Jersey Foundation, attorneys; Alexander Shalom and Jeanne LoCicero, on the brief).

Sara M. Gregory, Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, Michael L. Zuckerman, Deputy Solicitor General, Sookie Bae-Park, and Raymond R. Chance, III, Assistant Attorneys General, of counsel, Sara M. Gregory, of counsel and on the brief, and Viviana M. Hanley, Deputy Attorney General, on the brief).

Diana C. Manning submitted a brief on behalf of amicus curiae Partners for Women and Justice, Inc. (Bressler, Amery & Ross, attorneys; Diana C. Manning, Benjamin J. DiLorenzo, and Kyle A. Valente, on the brief).

Frank L. Corrado submitted a brief on behalf of amici curiae Reporters Committee for Freedom of the Press, Dow Jones & Company, Gannett, Hearst, The New Jersey Press Association, The New York News Publishers Association, New York Public Radio, and The New York Times Company (Barry, Corrado & Grassi, attorneys; Frank L. Corrado, on the brief).

---

JUSTICE WAINER APTER delivered the opinion of the Court.

---

Antonio Fuster went to the Chatham Township Police Department to report that his special needs child had accused an adult male relative of sexual misconduct. His interview with police was recorded on a body worn camera video. Fuster and his wife, Brianna Devine (together, plaintiffs), seek access

2

to that video under the Open Public Records Act (OPRA)[1] and the common law right of access.

Plaintiffs allege that they are entitled to the video under OPRA and the common law because of two provisions of the 2020 Body Worn Camera Law (BWCL), N.J.S.A. 40A:14-118.5(k) and (*l*). Subsection (k) instructs that "to effectuate" N.J.S.A. 40A:14-118.5(j)(2)(e), which allows a member of the public who is the subject of a body worn camera video to request that police retain the video for three years, "the member of the public . . . shall be permitted to review the body worn camera recording in accordance with the provisions of [OPRA] to determine whether to request a three-year retention period." N.J.S.A. 40A:14-118.5(k). We hold that subsection (k) does not permit plaintiffs to review the video in this case, because Fuster has already requested that the video be retained for three years, and Devine is neither the subject of the video nor one of the other specified persons entitled to review.

Subsection (*l*) provides: "Notwithstanding that a criminal investigatory record does not constitute a government record under [OPRA's definitions

---

[1] On June 5, 2024, Governor Murphy signed into law L. 2024, c. 16, amending OPRA. Those amendments went into effect on September 3, 2024. Because the amendments are not at issue in this case, this opinion relies only on the text of OPRA in effect prior to September 3, 2024. All citations to N.J.S.A. 47:1A-1 to -13 are to the pre-amendment language.

3

section], only the following body worn camera recordings shall be exempt from public inspection." It then lists four exemptions, none of which are relevant to this case. N.J.S.A. 40A:14-118.5(*l*). Plaintiffs maintain that the provision clearly states that these four exemptions are the only body worn camera videos that can be exempt from public access under OPRA, and that none of OPRA's exemptions can apply to a body worn camera video. We disagree. Given the Legislature's repeated citations to OPRA in the BWCL, it is not clear that the Legislature intended for the exemptions in subsection (*l*) to supplant, rather than supplement, OPRA.

We need not decide the question, however, because even if OPRA's exemptions may apply to a body worn camera video, OPRA does not contain any explicit exemption for "information received by law enforcement regarding an individual who was not arrested or charged." Cf. Fuster v. Township of Chatham, 477 N.J. Super. 477, 483 (App. Div. 2023). Neither has our case law ever held that such information must automatically be withheld under OPRA.

We therefore reverse the Appellate Division's judgment and order that the body worn camera footage be released to plaintiffs under the circumstances of this case. We do not reach plaintiffs' common law claims.

4

I.

A.

We begin with the facts alleged in the complaint and the documents attached thereto.

In May 2022, Fuster went to the Chatham Township Police Department to report that his special needs child had accused an adult male relative of sexual misconduct. Police interviewed Fuster. The conversation was recorded on a body worn camera.

Fuster and Devine reviewed the initial police report based on the interview. They informed police that the "report was grossly inaccurate and was missing significant information" that Fuster had shared.

After police advised plaintiffs that no criminal charges would be brought against the adult male relative, plaintiffs "sought to obtain a copy of the video of Mr. Fuster's interview with police so they could prove that the report was inaccurate and perhaps file an internal affairs complaint against the officers."

To that end, Fuster submitted an OPRA Request Form requesting any written police reports and the body worn camera video footage of his interview. A records clerk from the police department emailed Fuster the written police reports but denied the request for the video. Handwritten notes

5

on Fuster's OPRA form state: "Request for video of interview is denied as it relates to a juvenile case & there are no charges."

The written reports sent to Fuster -- including the initial police report and supplementary reports -- were largely unredacted and included information captured on the body worn camera video. The next day, Fuster submitted another OPRA Request Form, this time stating that he was requesting copies of the video of his interview under the common law.

On September 16, 2022, Fuster emailed Chatham records custodian Gregory LaConte: "I will also be requesting said media . . . to be held on to for the 3 years as stated in the [BWC] law just in case any mishaps occur in the future." Fuster followed up that afternoon, formally requesting "to preserve the BWC recordings indefinitely in their original unaltered form." On the same day, Devine submitted an OPRA Request Form, asking to view the video of Fuster's in-person interview "to determine whether or not to file a request for a 3 year retention period."

LaConte sent Fuster and Devine identical letters denying their OPRA requests. The letters stated that "disclosure would not advance the public interest" and that "[a]ny disclosure could potentially impede agency investigative functions by providing information potentially involving third parties, who also have a privacy right." The letters appended a five-page list

6

of OPRA exemptions.  They did not identify which exemption, if any, prevented release of the body worn camera footage of Fuster's in-person interview.

Devine sent a follow-up email asking LaConte to reconsider, specifically citing the 2020 BWCL, which she stated granted her "a right to request this video under OPRA because my juvenile child is the subject being spoken about in the video, and we have a right to request a 3-year retention schedule."

B.

Plaintiffs filed a complaint against the Township of Chatham and LaConte (together, defendants), alleging defendants had unlawfully denied their right to access the body worn camera video under both OPRA and the common law.  Plaintiffs specifically alleged that they were "entitled to access" the video "under OPRA" and that the "BWC footage [was] not exempt from access under OPRA."  According to plaintiffs, there was "no reasonable expectation of privacy that would warrant withholding a copy of the video" because "Mr. Fuster is the subject of the video and thus knows all of the information contained" in it.  Plaintiffs demanded release of the footage or, in the alternative, production of the video for in camera review, as well as counsel fees and costs.

7

Defendants responded that they were "under an obligation" to protect the privacy rights of plaintiffs' son, and that releasing the video would violate the accused relative's "reasonable expectation of privacy." They requested dismissal of the complaint, appointment of an attorney to represent plaintiffs' son, and notification of the accused family members so that they could be represented in court, as well as fees and costs.

In a written opinion and order, the trial court entered judgment in favor of defendants. At the outset, the court held that the body worn camera footage was a "government record" under OPRA and was not exempt from disclosure as a "criminal investigatory record" because it was "required by law to be created or maintained" pursuant to the 2020 BWCL, citing N.J.S.A. 47:1A-1, 47:1A-1.1, and 40A:14-118.5. The court also concluded that Fuster was the "subject" of the body worn camera footage under N.J.S.A. 40A:14-118.5(a) and (j)(2)(e) and therefore had standing to bring a claim under OPRA. The court additionally held that "an alleged violation of subsection (*l*) of [the] body-worn camera law, N.J.S.A. 40A:14-118.5, may give rise to a cause of action under OPRA."

The court concluded, however, that "defendants properly denied plaintiffs' OPRA requests pursuant to N.J.S.A. 47:1A-9(b)," which states that OPRA "shall not abrogate or erode any . . . grant of confidentiality heretofore

8

established or recognized by . . . judicial case law." Relying on the Appellate Division's decision in North Jersey Media Group Inc. v. Bergen County Prosecutor's Office (BCPO), 447 N.J. Super. 182, 203-04 (App. Div. 2016), the trial court explained that "information received or maintained by law enforcement agencies regarding a person who has not been arrested or charged with an offense," was "confidential and protected under common law." The court quoted BCPO's rationale that confidentiality for investigatory records related to a person who has not been charged "promotes both the integrity and effectiveness of law enforcement efforts" and "protects the privacy interest of the [uncharged] individual who, lacking an opportunity to challenge allegations in court, would face irremediable public condemnation." (quoting id. at 204). It held that defendants properly refused to release the body worn camera footage pursuant to N.J.S.A. 47:1A-9(b) because the accused relative was never charged.

The trial court rejected plaintiffs' common law claim, holding that plaintiffs had not shown that the public's interest in disclosure outweighed the government's interest in confidentiality because "the BWC footage is highly sensitive in nature, and the accused third party was never charged."

9

C.

Plaintiffs appealed.  The Appellate Division affirmed in a published opinion.  Fuster, 477 N.J. Super. at 498.

The appellate court first held that the "exemptions listed in N.J.S.A. 40A:14-118.5(*l*) are in addition to OPRA's exemptions" because the "plain language of the BWCL's inspection provision, N.J.S.A. 40A:14-118.5(k), provides that a review of a video is subject to OPRA."  Id. at 491.

The court then concluded that defendants properly withheld the video under N.J.S.A. 47:1A-9(b) because "the video was exempt from disclosure under judicial case law," id. at 491, i.e., "the well-established confidentiality exemption protecting an uncharged person's law enforcement records from disclosure," id. at 493.  Acknowledging that this confidentiality exemption was not found "'within the four corners of OPRA'" or "within the purview of the BWCL," id. at 491 (quoting BCPO, 447 N.J. Super. at 201), the Appellate Division nonetheless concluded that applying "the confidentiality exemption is appropriate here," id. at 493.

Lastly, the Appellate Division held that plaintiffs had no common law right of access because the factors set forth in Loigman v. Kimmelman, 102 N.J. 98, 113 (1986), tipped in favor of non-disclosure.  Id. at 495-96.  Notwithstanding plaintiffs' "strong personal interest" in obtaining the video,

providing them access would "impede law enforcement's investigative function because [future] witnesses may choose not to come forward." Id. at 496-97.  Release of the video would also harm "an uncharged party [who] has no opportunity to be informed of the potential disclosure by law enforcement and thus has no ability to object and be heard." Id. at 497.

## D.

We granted plaintiffs' petition for certification.  257 N.J. 18 (2024).  We also granted leave to appear as amici curiae to the Attorney General of New Jersey (Attorney General), the American Civil Liberties Union of New Jersey (ACLU), Reporters Committee for Freedom of the Press and Seven Media Organizations (Reporters Committee), and Partners for Women and Justice, Inc. (Partners).

## II.

## A.

Plaintiffs argue that the "Legislature made it clear in passing the BWCL that 'only' certain categories of BWC videos 'shall be exempt from public inspection.'"  (quoting N.J.S.A. 40A:14-118.5(*l*)).  The four exemptions listed in subsection (*l*), plaintiffs contend, are exclusive, and all agree that none apply in this case.  This Court must therefore apply the plain language of the BWCL and order the video to be released, plaintiffs maintain.  According to

plaintiffs, "[t]o the extent some videos are accessible under the BWCL where they would otherwise be exempt if OPRA's ordinary exemptions also applied, that was a policy decision by the Legislature that this Court must respect."

Plaintiffs also assert that even if OPRA's exemptions applied, there is no "judicial privilege" or "grant of confidentiality" for all "records relating to a person who is 'criminally investigated but neither arrested nor charged,'" contrary to the Appellate Division's decision. Instead, there is simply "old jurisprudence concluding that certain law enforcement records were outside" the scope of OPRA's predecessor, the Right to Know Law (RTKL), because they were not required by law to be made, maintained, or kept on file. Plaintiffs add that, even if such a privilege did exist, it "should not preclude a victim from obtaining copies of records of their own complaints."

In support of plaintiffs, the ACLU submits that "[t]he BWC Law sets forth an exclusive list of situations in which recordings may be withheld." The Reporters Committee likewise agrees that "OPRA's enumerated exemptions do not apply to the body-worn camera footage sought by" plaintiffs, because N.J.S.A. 40A:14-118.5(*l*) "states that 'only [four types of] body worn camera recordings shall be exempt from public inspection.'" Partners asserts that "a victim's interests in obtaining" footage of their own interview with police "for use as potential evidence in a future proceeding far outweigh an uncharged

12

individual's interests in confidentiality and, thus, require disclosure of the footage to the victim." Partners also emphasizes that "[v]ictims should be treated with fairness, compassion, and respect by the criminal justice system."

B.

Defendants argue "that the exemptions to disclosure enumerated within the BWCL are not in abrogation of those set forth in OPRA, but rather, are supplemental to it." Reading the BWCL exemptions as exclusive, defendants suggest, "would render meaningless the plain language within the BWCL which renders that enactment subject to OPRA." According to defendants, "[h]ad the Legislature intended to either" preclude the application of OPRA's exemptions or "limit OPRA's application to only . . . procedural requirements, as [p]laintiffs have argued," it would have done so expressly.

The Appellate Division therefore correctly applied "the OPRA exemption found at N.J.S.A. 47:1A-9(b), which excludes from disclosure a public record deemed privileged or confidential pursuant to established judicial case law," defendants contend. According to defendants, "[c]ase law is beyond clear that our courts do indeed recognize the privacy rights of those who are investigated for a crime, but are neither arrested nor charged." Defendants emphasize this "is not tethered to the common law right of access, but stands apart as a recognized privacy right."

13

The Attorney General submits that subsection (*l*) of the BWCL "makes clear that BWC footage cannot be withheld as a 'criminal investigatory record'" under OPRA, but OPRA's remaining exemptions continue to apply. Whereas subsection (k) references OPRA generally, the Attorney General points out, subsection (*l*) references only OPRA's criminal investigatory record exemption. That the Legislature "chose to vary from the language it used in subsection (k), and to instead refer only to the [criminal investigatory record] exemption rather than to OPRA as a whole" in subsection (*l*), the Attorney General avers, "shows its intent to clarify the role of one specific exemption, not abrogate all" OPRA exemptions. If plaintiffs were correct, the Attorney General continues, body worn camera videos containing, for example (1) "any portion of" a deceased person's body; (2) "emergency or security information or procedures for any buildings or facility"; (3) "victims' records"; (4) "security measures and surveillance techniques which, if disclosed, would create a risk to the safety of persons, property, electronic data or software"; or (5) any person's "social security number, credit card number, debit card number, bank account information, [or] month and day of birth" would need to be released for public inspection despite OPRA's express language to the contrary. (quoting N.J.S.A. 47:1A-1.1).

14

III.

A.

We review questions of statutory interpretation de novo.  W.S. v.

Hildreth, 252 N.J. 506, 518 (2023).  "Likewise, determinations about the

applicability of OPRA and its exemptions are legal conclusions . . . subject to

de novo review."  In re N.J. Firemen's Ass'n Obligation, 230 N.J. 258, 273-74

(2017) (citations omitted).

When interpreting statutes, "this Court aims to effectuate the

Legislature's intent."  Hildreth, 252 N.J. at 518.  "There is no more persuasive

evidence of legislative intent than the words by which the Legislature

undertook to express its purpose . . . ."  Perez v. Zagami, LLC, 218 N.J. 202,

209-10 (2014).  We therefore look first "to the plain language of the statute."

Id. at 210.  "We ascribe to the statutory words their ordinary meaning and

significance and read them in context with related provisions so as to give

sense to the legislation as a whole."  DiProspero v. Penn, 183 N.J. 477, 492

(2005) (citation omitted).  In doing so, we "strive for an interpretation that

gives effect to all of the statutory provisions and does not render any language

inoperative, superfluous, void or insignificant."  G.S. v. Dep't of Hum. Servs.,

157 N.J. 161, 172 (1999).

"If the plain language of a statute is clear, our task is complete."  Savage v. Township of Neptune, 257 N.J. 204, 215 (2024).  "[I]f there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction.'"  DiProspero, 183 N.J. at 492-93 (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75 (2004)).

B.

In the wake of the murder of George Floyd, the Legislature enacted, and the Governor signed, two bills to require law enforcement officers to wear body worn cameras, and to regulate the use of those cameras.  See A. 4312 (2020); S. 1163 (2020) (together, BWCL).

Pursuant to the new law, "every uniformed State, county, and municipal patrol law enforcement officer shall wear a body worn camera that electronically records audio and video while acting in the performance of the officer's official duties," unless a specific exception applies.  N.J.S.A. 40A:14-118.3(a).  In addition, the "camera shall be activated whenever the officer is responding to a call for service or at the initiation of any other law enforcement or investigative encounter between an officer and a member of the public," again unless a delineated exception applies.  N.J.S.A. 40A:14-118.5(c)(1).

16

Police must retain video from the body worn cameras "for not less than 180 days from the date it was recorded" unless an additional retention period applies. N.J.S.A. 40A:14-118.5(j). One provision requires police to retain a body worn camera recording

> for not less than three years if voluntarily requested by: . . . (e) any member of the public who is a subject of the body worn camera recording; (f) any parent or legal guardian of a minor who is a subject of the body worn camera recording; or (g) a deceased subject's next of kin . . . .
>
> [N.J.S.A. 40A:14-118.5(j)(2)(e) to (g).]

The "'[s]ubject of the video footage' means any . . . suspect, victim, detainee, conversant, injured party, or other similarly situated person who appears on the body worn camera recording, and shall not include a person who only incidentally appears on the recording." N.J.S.A. 40A:14-118.5(a).

Thus, as relevant to this case, the subject of a body worn camera recording may request that police retain the footage for three years. So that the subject can make an informed decision regarding whether to request that longer retention period, the BWCL grants them special access to review the video. Specifically, N.J.S.A. 40A:14-118.5(k) provides:

> To effectuate subparagraphs (e), (f), and (g) of paragraph (2) of subsection j. of this section, the member of the public, parent or legal guardian, or next of kin or designee shall be permitted to review the body

17

worn camera recording in accordance with the provisions of [N.J.S.A. 47:1A-1 to -13, i.e., OPRA] to determine whether to request a three-year retention period.

Fuster is a "member of the public who is a subject of the body worn camera recording" under subsection (j)(2)(e), because he is a "conversant" who "appears on the body worn camera recording" more than "incidentally," under subsection (a). Subsection (k) therefore granted him the right to "review the body worn camera recording . . . to determine whether to request a three-year retention period." N.J.S.A. 40A:14-118.5(k).

However, after requesting to review the body worn camera video and being denied that right, on September 16, 2022, Fuster formally requested that police retain the video for three years. He is therefore not now entitled to review the video "to determine whether to request" a three-year retention period that he has already requested.

We agree with the Attorney General that the plain language of subsection (k) does not grant "a right for the subject to review the recording for any purpose at any time." Instead, it grants the subject of a body worn camera video a right to review the video during a specific time, and for a specific purpose: before the subject has requested a three-year retention

18

period, for the purpose of making an informed decision about whether to request that additional retention period.

Under subsection (k), defendants erred in refusing to permit Fuster to review the video "to determine whether to request a three-year retention period." However, because he went ahead and requested the extended retention period anyway, subsection (k) no longer grants Fuster the right to review the video.

And subsection (k) never provided such a right to Devine, as she is neither a subject of the recording nor one of the other specified persons entitled to review under that provision.[2] Subsection (k) therefore does not help plaintiffs in this case.

We next turn to subsection (*l*). It states:

> Notwithstanding that a criminal investigatory record does not constitute a government record under [N.J.S.A. 47:1A-1.1, OPRA's definitions section], only the following body worn camera recordings shall be exempt from public inspection:
>
> > (1) body worn camera recordings not subject to a minimum three-year retention period or

---

[2] Devine argued her child was "the subject being spoken about in the video," perhaps attempting to invoke the special access provided to the "parent or legal guardian of a minor who is a subject of the body worn camera recording" pursuant to N.J.S.A. 40A:14-118.5(j)(2)(f) and N.J.S.A. 40A-14-118.5(k). But here, plaintiffs' minor child is not the "subject of the body worn camera recording" because he does not "appear[]" on the recording. N.J.S.A. 40A:14-118.5(a).

19

additional retention requirements pursuant to subsection j. of this section;

(2) body worn camera recordings subject to a minimum three-year retention period solely and exclusively pursuant to paragraph (1) of subsection j. of this section if the subject of the body worn camera recording making the complaint requests the body worn camera recording not be made available to the public;

(3) body worn camera recordings subject to a minimum three-year retention period solely and exclusively pursuant to subparagraph (a), (b), (c), or (d) of paragraph (2) of subsection j. of this section; and

(4) body worn camera recordings subject to a minimum three-year retention period solely and exclusively pursuant to subparagraph (e), (f), or (g) of paragraph (2) of subsection j. of this section if a member, parent or legal guardian, or next of kin or designee requests the body worn camera recording not be made available to the public.

[N.J.S.A. 40A:14-118.5(*l*).]

All agree that none of these four exemptions apply in this case. The first exemption does not apply because the body worn camera video became subject to the three-year retention period in subsection (j)(2)(e) when Fuster requested that police retain it for three years. The second and third exemptions are irrelevant because the required three-year retention period is pursuant to subsection (j)(2)(e), not subsection (j)(1) or subsections (j)(2)(a), (b), (c), or

20

(d). And the fourth exemption does not apply because Fuster did not request that the recording not be made available.

Plaintiffs argue that because none of the four exemptions apply, they are entitled to the video under subsection (*l*), without reference to OPRA's separate exemptions from disclosure. Their position has some appeal.

Plaintiffs rely on the language "only the following body worn camera recordings shall be exempt from public inspection," which precedes the four listed exemptions. Plaintiffs are correct that the ordinary meaning of the word "only" is "a single fact or instance and nothing more or different"; "solely"; "exclusively." Merriam-Webster's New Collegiate Dictionary 867 (11th ed. 2020). That phrase therefore most naturally suggests that the four exemptions enumerated in subsection (*l*) are the sole and exclusive types of "body worn camera recordings" that "shall be exempt from public inspection."

But despite the Legislature's use of the word "only," it is not clear that the Legislature meant for the four exemptions delineated in subsection (*l*) to be the only types of body worn camera video not available for public inspection without regard to OPRA's separately enumerated exemptions. First, the Legislature repeatedly referenced OPRA in the BWCL. As earlier noted, subsection (k) specifically notes that review of a body worn camera video

21

under the BWCL "shall be permitted . . . in accordance with the provisions of [N.J.S.A. 47:1A-1 to -13]," i.e., OPRA.

Second, the language that plaintiffs point to in subsection (*l*) is preceded by the words "[n]otwithstanding that a criminal investigatory record does not constitute a government record under [N.J.S.A. 47:1A-1.1]," i.e., OPRA's definitions section. Had the Legislature intended for the BWCL as a whole, or subsection (*l*) alone, to stand apart from OPRA, it is not clear why the Legislature would have included a reference to OPRA in the text of this subsection. In other words, if the Legislature meant for the BWCL to displace, rather than complement, OPRA when it comes to body worn camera videos, why did the Legislature include the "notwithstanding" clause at all?

The Attorney General argues that the "notwithstanding" clause is there to clarify that body worn camera videos do not fall within OPRA's exemption for criminal investigatory records. But that is clear from the plain text of OPRA and the BWCL even without the clause. As earlier noted, the BWCL requires that body worn cameras be worn and activated to electronically record audio and video absent limited exceptions. N.J.S.A. 40A:14-118.3(a), -118.5(c)(1). And it specifies detailed retention requirements. N.J.S.A. 40A:14-118.5(j). Body worn camera recordings are therefore required by law, i.e., the BWCL, to be made, maintained, and kept.

22

They thus cannot fall within OPRA's exemption for a "criminal investigatory record," regardless of the notwithstanding clause. Under OPRA's definitions section, "a government record shall not include the following information which is deemed to be confidential for the purposes of [OPRA]: . . . criminal investigatory records." N.J.S.A. 47:1A-1.1. OPRA then defines a criminal investigatory record as "<u>a record which is not required by law to be made, maintained or kept on file</u> that is held by a law enforcement agency which pertains to any criminal investigation or related civil enforcement proceeding." <u>Ibid.</u> (emphasis added). Even if body worn camera videos are held by law enforcement agencies and pertain to criminal investigations, they are by definition <u>not</u> criminal investigatory records under OPRA because they are "required by law" -- i.e., the BWCL -- "to be made, maintained or kept on file." <u>Ibid.</u>[3] We thus do not agree with the Attorney

---

[3] The legislative history reveals possible confusion regarding this Court's holdings in <u>North Jersey Media Group, Inc. v. Township of Lyndhurst</u>, 229 N.J. 541 (2017), and <u>Paff v. Ocean County Prosecutor's Office</u>, 235 N.J. 1 (2018), both of which were decided a few years before the BWCL was enacted. In <u>Lyndhurst</u>, this Court held that police dash-camera footage fell within OPRA's exemption for criminal investigatory records because at the time it was not "required by law" to be made. 229 N.J. at 567-69. In <u>Paff</u>, we held that a recording made by a police officer's "Mobile Video Recording Equipment" was likewise exempt as a criminal investigatory record because it was not "required by law" to be made or kept at the time. 235 N.J. at 20-22; <u>see also</u> <u>Sponsor's Statement to A. 4312</u> 7 (<u>L.</u> 2020, <u>c.</u> 129) ("The bill also specifies when video footage from a body camera is exempt from the State's

23

General that subsection (*l*) as a whole makes clear that body worn camera footage cannot be withheld as a criminal investigatory record under OPRA but can be withheld under OPRA's remaining exemptions.

Yet we are left with the BWCL's repeated references to OPRA, which seem inconsistent with a legislative intent for the BWCL to altogether supplant, rather than supplement, OPRA.

C.

We need not decide whether subsection (*l*) of the BWCL abrogates OPRA's exemptions because there is no OPRA exemption that supports defendants' refusal to release the video in this case. We therefore reverse the Appellate Division's judgment.

OPRA provides that "government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions." N.J.S.A. 47:1A-1. None of the exemptions from disclosure enumerated in N.J.S.A. 47:1A-1.1 -- encompassing, as the Attorney General points out, footage of "any portion of the body[] of a deceased person,"

---

open public records act. Recent case law has held that police video recordings are exempt from public disclosure under the State's open public records act because they pertain to criminal investigations. Notwithstanding this law, the bill specifies that video footage from a body worn camera is not subject to public inspection only when [one of the four exemptions in subsection (*l*) applies]." (emphasis added)).

24

"victims' records," "trade secrets and proprietary commercial or financial information," "[building] emergency or security information or procedures," etc. -- apply to the footage at issue here. Defendants therefore seek to exempt this footage from disclosure under two other provisions of OPRA: N.J.S.A. 47:1A-9(b) and N.J.S.A. 47:1A-1. Neither is availing.

1.

N.J.S.A. 47:1A-9(b) states:

> The provisions of this act . . . shall not abrogate or erode any executive or legislative privilege or grant of confidentiality heretofore established or recognized by the Constitution of this State, statute, court rule or judicial case law, which privilege or grant of confidentiality may duly be claimed to restrict public access to a public record or government record.

Defendants assert, and the trial court and Appellate Division held, that a "'grant of confidentiality heretofore established or recognized by . . . judicial case law . . . restrict[s] public access to'" the video in this case: namely, the "long-established confidentiality exemption" protecting "information received by law enforcement regarding an individual who was not arrested or charged." Fuster, 477 N.J. Super. at 483, 489 (quoting N.J.S.A. 47:1A-9(b)).

The trial court and Appellate Division rooted that exemption in BCPO, 447 N.J. Super. 182. BCPO held, in what it referred to as a "matter of first impression," that "records relating to a person who has not been arrested or

25

charged with an offense are entitled to confidentiality based upon long-established judicial precedent." Id. at 189. "Therefore, pursuant to N.J.S.A. 47:1A-9(b), an exemption exists under OPRA" that allows a prosecutor to "neither confirm nor deny" (otherwise known as a "Glomar response"), the existence of records "regarding a person who was not charged with any crime." Id. at 188-89, 196.

OPRA became effective on July 7, 2002. See L. 2001, c. 404. The Appellate Division therefore could not, in 2016, create a new "grant of confidentiality" under N.J.S.A. 47:1A-9(b); it was limited to grants of confidentiality "heretofore established or recognized by . . . judicial case law" -- i.e., grants of confidentiality that had already been "established or recognized" before OPRA's enactment.

According to BCPO, "before OPRA was enacted, judicial decisions recognized the need to maintain 'a high degree of confidentiality' for records regarding a person who has not been arrested or charged." 447 N.J. Super. at 203-04. For support, BCPO cited three decisions from this Court: Nero v. Hyland, 76 N.J. 213 (1978), State v. Marshall, 148 N.J. 89 (1997), and Loigman, 102 N.J. 98. None create any automatic grant of confidentiality for all law enforcement records related to a person not arrested or charged with a crime.

26

In <u>Nero</u>, Governor Byrne had considered, and then decided against, appointing John Nero to a position on the New Jersey Lottery Commission. 76 N.J. at 216-17. Nero sued to get access to the character investigation prepared by the State Police. <u>Id.</u> at 217 & n.1. We held "that character investigations made at the behest of the Governor as chief executive in connection with a contemplated nomination are not public records under the Right to Know Law, N.J.S.A. 47:1A-2, since they are not 'required by law to be made, maintained or kept on file.'" <u>Id.</u> at 220 (quoting the RTKL, formerly codified at N.J.S.A. 47:1A-2). We also denied Nero access under the common law, relying on the "executive privilege" that "protects and insulates the sensitive decisional and consultative responsibilities of the Governor" in the appointment process. <u>Id.</u> at 225-26.

In <u>Marshall</u>, a criminal defendant who had been convicted of murder-by-hire "moved to inspect the State's entire file" as part of his petition for post-conviction relief. 148 N.J. at 138, 268. This Court held that "[t]he Right-to-Know Law does not provide defendant with the right to inspect the law-enforcement files sought in this case because no law or regulation requires that such files 'be made, maintained or kept.'" <u>Id.</u> at 272-73 (quoting the RTKL, N.J.S.A. 47:1A-2). The Court also denied access under the common law, holding "that the common-law right to inspect public documents may not be

27

invoked in a pending criminal case by a defendant seeking discovery rights beyond those granted" by the Court Rules. Id. at 274.

In Loigman, an attorney sued to obtain a copy of the Attorney General's audit of various monetary disbursements made by the Monmouth County Prosecutor. 102 N.J. at 101. This Court did not disturb the Appellate Division's determination that the audit was not a public record under the RTKL because it was not "required by law to be made, maintained, or kept on file." Id. at 102-03. In assessing whether the attorney was entitled to inspect the audit under the common law, this Court rejected the Attorney General's assertion that Nero "sustain[ed] an absolute privilege of secrecy for all such investigatory materials." Id. at 103-04. Instead, this Court summarized Nero as holding only "that a State Police character investigation of an applicant for a public position is so sensitive that disclosing the materials to the very individual whose qualifications were being canvassed would chill the investigative process." Id. at 104.

The Loigman Court reiterated that under the common law, "there [is] no fixed rule for determining whether disclosure is appropriate." Ibid. Instead, a court must "balance, in each case, the individual's right to the information against the public interest in the confidentiality of the file." Ibid. The Court then set forth factors that a trial court may consider during this "exquisite

28

weighing process." Id. at 108 (quoting Beck v. Bluestein, 194 N.J. Super. 247, 263 (App. Div. 1984)). Those include:

> (1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.
>
> [Id. at 113.]

As is clear from that summary, none of these cases "establish[]" any broad "grant of confidentiality" for records related to a person who has been investigated but not arrested or charged with a crime that would then not be "abrogate[d] or erode[d]" by OPRA in 2002. N.J.S.A. 47:1A-9(b). Indeed, they do not create any absolute grant of confidentiality at all.

In all three cases, the Court's holdings under OPRA's predecessor, the RTKL, began and ended with the finding that the records were "not public records" because they were not "required by law to be made, maintained, or

29

kept on file.'" Nero, 76 N.J. at 220; accord Marshall, 148 N.J. at 272-73; Loigman, 102 N.J. at 102-03. Here, as we have already explained, the withheld body worn camera footage was, without dispute, "required by law to be made, maintained or kept on file," N.J.S.A. 47:1A-1.1, and falls comfortably within OPRA's definition of a government record.

As to the common law, we based our holding in Nero on the "executive privilege" that "protects and insulates" the Governor's appointment process. 76 N.J. at 225-26. Marshall held that criminal defendants could not use the common law to obtain documents they would not otherwise be entitled to access under the Court's discovery rules. 148 N.J. at 274. And in Loigman, we did not make any final determination as to the Attorney General's audit; we simply set forth the factors that a court should consider in undertaking the "delicate weighing process in the sensitive area of executive privilege." 102 N.J. at 108.

We therefore hold that before OPRA was enacted, judicial case law in this State had not established or recognized any automatic grant of confidentiality for all law enforcement records related to a person not arrested or charged with an offense. There was therefore nothing in this regard for OPRA to not "abrogate or erode" under N.J.S.A. 47:1A-9(b) when it came into effect. The Appellate Division erred in holding otherwise.

2.

Nor does the protection of a "citizen's reasonable expectation of privacy," N.J.S.A 47:1A-1, justify withholding the video under OPRA. OPRA's legislative findings and declarations provide:

> [G]overnment records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest . . . . [A] public agency has a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy . . . .
>
> [Ibid.]

When assessing a claim from a public agency that disclosure of "a citizen's personal information with which it has been entrusted . . . would violate the citizen's reasonable expectation of privacy," our Court considers the following factors:

> (1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognized public interest militating toward access.

31

[Burnett v. County of Bergen, 198 N.J. 408, 427 (2009)
(quoting Doe v. Poritz, 142 N.J. 1, 88 (1995)).]

Applying the language in N.J.S.A 47:1A-1 and the Doe factors, we have previously required the redaction of social security numbers from land title records prior to their release to a commercial business, id. at 428, 437; denied public access to financial relief checks issued by the New Jersey Firemen's Association to one of its members, Firemen's Ass'n Obligation, 230 N.J. at 266, 279-80; and remanded to the trial court to redact from the requested report "at a minimum . . . the names of [internal affairs] complainants, witnesses, informants, and cooperators . . . ; non-public, personal identifying information . . . such as . . . home addresses and phone numbers; and [other] personal information that would violate a person's reasonable expectation of privacy if disclosed, such as medical information," Rivera v. Union Cnty. Prosecutor's Off., 250 N.J. 124, 150 (2022).

We have refused to allow the withholding of a settlement agreement between Monmouth County and an employee who filed a public lawsuit claiming sex discrimination, Asbury Park Press v. County of Monmouth, 201 N.J. 5, 7 (2010); names and addresses of dog owners contained in dog license records, Bozzi v. City of Jersey City, 248 N.J. 274, 286-87 (2021); names and addresses of successful bidders at a public auction of seized property forfeited to the government, Brennan v. Bergen Cnty. Prosecutor's Off., 233 N.J. 330,

32

333, 342 (2018); and footage from a police vehicle's mobile video recorder depicting a driver's arrest in a public place, Paff v. Ocean Cnty. Prosecutor's Off., 235 N.J. 1, 8-9, 27 (2018).

The trial court held that the body worn camera footage "was not properly withheld pursuant to OPRA's general privacy provision" because the footage "consists entirely of information about third parties that did not 'originate' with those individuals and was not 'entrusted' by them to the government, but rather was supplied directly to the police by Fuster." We have never expressly considered whether, under N.J.S.A. 47:1A-1, a public agency can withhold a government record to "safeguard" the "reasonable expectation of privacy" of a person who did not "entrust[]" the public agency with their "personal information." We need not reach the question here, because even if N.J.S.A. 47:1A-1 could be read to apply in such a circumstance, we find that under the specific facts of this case, defendants' withholding of the body worn camera recording simply does not protect any significant privacy interest.

Recall that here, the party seeking access to the body worn camera video is not a third party but the subject of the video. And the withheld footage, required by law to be made, is not a recording of the State's investigation, but a verbatim recording of Fuster's own complaint as he made it to the police (Doe factors one and two). In addition, defendants have already released

33

details of their investigation to Fuster.  In terms of the privacy interests of the adult male relative, if Fuster wished to publicize the allegations, he could film himself making them again and broadcast the video on social media or to news sites (factors three and five).

Disclosing a body worn camera recording to an alleged victim who comes forward and speaks to police and then requests the recording of their own statement would also not discourage alleged victims from providing information to law enforcement.  Instead, as Partners and plaintiffs point out, it is treating victims as though they were perpetrators that can make victims unwilling to report incidents to police (factor four).  In this case, plaintiffs seek to inspect the video to advocate for their child and possibly file an internal affairs report (factor six).  In other cases, a crime victim may seek a copy of their own body-worn-camera-recorded statement to pursue applications for protections under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, or the Victim's Assistance and Survivor Protection Act, N.J.S.A. 2C:14-13 to -21 (factor six).  Finally, under our State Constitution, "[a] victim of a crime shall be treated with fairness, compassion and respect by the criminal justice system."  N.J. Const. art. I, ¶ 22. Prohibiting an alleged crime victim from inspecting the body worn camera

recording of their own police statement does not honor that mandate (factor seven).

We therefore hold that defendants are not entitled to withhold the video under N.J.S.A. 47:1A-1.

We do not address whether any redactions to body worn camera recordings may be appropriate, as defendants did not request any redactions to the video in this case. We also do not reach plaintiffs' common law claim because we hold they are entitled to access the body worn camera footage under OPRA.

IV.

For the reasons stated, we reverse the Appellate Division's judgment and order the body worn camera footage released to plaintiffs for inspection.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FASCIALE, and NORIEGA join in JUSTICE WAINER APTER's opinion. JUSTICE PIERRE-LOUIS did not participate.